UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| MANUEL STEVEN GUARDADO,<br><br>Petitioner,<br>v.<br><br>NEVADA ATTORNEY GENERAL, *et al.*,<br><br>Respondents. | Case No. 3:10-cv-00103-MMD-WGC<br><br>ORDER |

Petitioner Manuel Steven Guardado, a prisoner in the custody of the State of Nevada, brings this habeas action under 28 U.S.C. § 2254 to challenge his 2004 Nevada state convictions for burglary, possession of burglary tools, possession of stolen property, and arson. After evaluating his claims on the merits, this Court denies Guardado's petition for a writ of habeas corpus, dismisses this action with prejudice, and denies a certificate of appealability.

I.  **BACKGROUND**

Around 5:00 am on June 9, 2003, the Reno Police Department received word that telephone lines were cut around Spiro's Sports Bar—which was a common theme in a string of sports bar burglaries.[1] Earlier in the day, as part of a multi-day surveillance to

---

[1] The Exhibits referenced in this Order are found in the Court's record at ECF Nos. 16–22 (Exhs. 1–112) and ECF No. 49 (Exhs. 113–133). All page citations are to the page numbers of the documents themselves, rather than the ECF-generated page numbers, except the citations to Exhs. 23 and 54 and ECF Nos. 47 and 75, which are to the ECF-generated page numbers.

1

catch the perpetrators of the burglaries, the detectives saw the petitioner and his brother, Ernest Jord Guardado ("Ernest")—the lead suspects in their investigation at that point—loading up a green Saturn at Ernest's apartment. (*See* Exh. 2 at 21–22.) Responding to the scene of the potential burglary, the detectives saw the green Saturn parked a few hundred feet away from the bar and noticed a figure in dark clothes, Ernest, standing in front of the bar. (Exh. 23 at 4.)

After a silent alarm was triggered, detectives saw another figure in dark clothes, Guardado, emerging from between two buildings across the street and approaching the car. (*See id.*) When the detectives identified themselves as police officers and ordered Guardado to surrender, he fled and threw a two-way radio onto the top of a nearby building but was nonetheless apprehended. (*See id.*) Ernest also fled, and was ultimately found hiding in the crawl space in a home. (*See id.* at 5.) Along his flight path, the detectives found gloves, a knit cap, a black sweatshirt, tools, a two-way radio, and a gaming-machine cash box. (*See id.*) During a search of the bar, the police noticed that the rear door had been forced open and a gaming machine had been broken open and its cash box removed. (*See id.* at 4–5.)

After being apprehended but not *Mirandized*, Guardado made a number of statements to the arresting officers. (*See* Exh. 2 at 10.) He first asked Detective Reed why they were chasing him, and when told that it was for robbery of Spiro's bar, Guardado said that he didn't burgle anything and that he was standing by another building that was across the street from the bar. (*See id.* at 11–12.) To another officer, he said that he ran "because [they] were chasing [him]" and he "didn't know who [they] were. Then [he] turned around, and [he] saw the black vest with the RPD patch on the front. And [he] thought at that point [he] might as well keep running because [he had] already started." (*Id.* at 20.) He also said that he "didn't do the burglary, but [he was] the lookout." (*Id.* at 85.)

On February 11, 2004, Guardado was indicted on eight counts: burglary of Spiro's bar on June 9, 2003, *see* NRS §§ 195.020, 205.060(1) (count 1); possession of tools for the commission of burglary on June 9, 2003, *see id.* § 205.080 (count 2); burglary of

another sports bar on May 20, 2003, *see id.* § 205.060(1) (count 3); first-degree arson of that sports bar on May 20, 2003, *see id.* § 205.010 (count 4); conspiracy to commit first-degree arson, *see id.* §§ 199.480, 205.010 (count 5); and possession of stolen property from the May 20, 2003, sports bar burglary, *see id.* § 205.275 (count 6); possession of stolen property for possessing a gun belonging to someone else, *see id.* § 205.275 (count 7); and possession of stolen property for possessing other items owned by the same person, *see id.* (count 8). (*See* Exh. 7 at 1–4.) On September 15, 2004, Guardado signed a plea deal pleading guilty to counts 1, 3, 4, 6, 7, and 8 in exchange for the State dismissing counts 2 and 5 and not pursuing giving Guardado habitual criminal status. (Exh. 32 at 1–2, 8; *see also* Exh. 31 at 7–8.) On November 5, 2004, the state district court found him guilty of the same and sentenced him to confinement for 48 to 120 months for counts 1 and 3, 72 to 180 months for count 4, and 24 to 60 months for counts 6, 7, and 8, each to run consecutively, in addition to monetary payments. (Exh. 34 at 1– 2; *see also* Exh. 33 at 15–16.)

Guardado appealed on April 21, 2005. (Exh. 48.) The Supreme Court of Nevada affirmed on August 18, 2005, with remittitur issuing on September 14, 2005. (Exhs. 52, 53.) He filed a habeas petition in state court on October 12, 2005. (Exh. 54; *see also* Exhs. 60, 65.) The state district court ordered an evidentiary hearing on the petition. (Exh. 71.) After the evidentiary hearing, the state district court denied the petition on October 8, 2008. (Exh. 87.) Guardado filed a motion for reconsideration, but it was denied on November 13, 2008. (Exhs. 92, 98.) He then appealed to the Supreme Court of Nevada. (Exh. 103.) The Supreme Court of Nevada affirmed on February 3, 2010, with remittitur issuing on March 2, 2010. (Exhs. 107, 108.)

Guardado filed his first petition for a writ of habeas corpus in federal court on April 26, 2010. (ECF No. 9.) The State filed a motion to dismiss, Guardado responded, and the State replied. (ECF Nos. 15, 26, 27.) This Court granted the motion in part and denied it in part, holding that all grounds except for Ground 2 failed to state a claim or were unexhausted in state court, thus creating a "mixed petition" of exhausted and

1  unexhausted claims. (ECF No. 31 at 8–9.) At this Court's invitation, Guardado moved for
2  a stay and abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005). (ECF No. 32; *see*
3  ECF No. 31 at 8 & n.4.) The State opposed, and Guardado replied. (ECF Nos. 33, 34.)
4  This Court granted Guardado's motion for a stay and abeyance on December 27, 2011.
5  (ECF No. 35 at 4.)

On February 2, 2012, Guardado filed his second petition for a writ of habeas corpus in state district court. (Exh. 116.) On March 28, 2012, the court denied his petition because it was procedurally barred by the one-year statute of limitations. (Exh. 118 (citing Nev. Rev. Stat. § 34.726).) Guardado appealed. The Supreme Court of Nevada affirmed on November 14, 2012, and remittitur issued on December 14, 2012. (Exhs. 131, 133.)

On December 13, 2012, Guardado filed a motion to lift the stay that this Court issued on December 27, 2011. (ECF No. 36.) This Court granted the motion on November 21, 2013. (ECF No. 38.) Guardado filed an amended petition for a writ of habeas in federal court on March 12, 2014. (ECF No. 47.) The State filed a motion to dismiss the amended petition, and Guardado responded. (ECF Nos. 48, 51.) This Court granted the motion to dismiss and issued judgment dismissing the entire petition. (ECF No. 56 at 8–9; ECF No. 57.) On February 27, 2015, Guardado filed a motion to amend the judgment, arguing that this Court erroneously dismissed Ground 2 for being procedurally barred in state court and procedurally defaulted in federal court in light of its previous order that Ground 2 was ripe for review on the merits. (ECF No. 58; *see* ECF No. 31 at 7–9.) This Court reopened the action, noted that it would resolve Ground 2 on the merits, and ordered the State to file an Answer as to Ground 2. (ECF No. 64 at 3.) The State did so, and Guardado filed a Reply. (ECF Nos. 71, 75.)

**II.     FEDERAL HABEAS REVIEW STANDARDS**

When a state court has adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling; that standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170

(2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.* at 181–88. The petitioner bears the burden of proof. *Id.* at 181.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* The Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* And "a federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. A decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *See, e.g.*, *id.* at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). When a state court's factual findings based on the record before it are challenged, the "unreasonable determination of fact" clause of 28 U.S.C. § 2254(d)(2) controls, which requires federal courts to be "particularly deferential" to state court factual determinations. *See, e.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This standard is not

satisfied by a mere showing that the state court finding was "clearly erroneous." *Id.* at 973. Rather, as the Ninth Circuit explained, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), a state court's factual findings are presumed to be correct and the petitioner must rebut that presumption by "clear and convincing evidence." In this inquiry, federal courts may not look to any factual basis not developed before the state court unless the petitioner both shows that the claim relies on either (a) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (b) "a factual predicate that could not have been previously discovered through the exercise of due diligence," and shows that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

When a state court summarily rejects a claim, it is the petitioner's burden to show that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

### III. ANALYSIS

In Ground 2—the only ground remaining (ECF No. 64 at 3)—Guardado argues that three instances of ineffective assistance of counsel warrant federal habeas relief: counsel's failure to investigate the circumstances of statements he made to police such that they might have properly been suppressed under *Miranda*; counsel's failure to investigate the case prior to advising Guardado to plead guilty; and counsel misinforming Guardado that he could withdraw the guilty plea after making it. (ECF No. 47 at 7–11.)

6

To succeed on an ineffective assistance of counsel claim, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Because Guardado pleaded guilty, he has to demonstrate "a reasonable probability that, but for counsel's errors, [a reasonable person in Guardado's shoes] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also id.* at 59–60 ("[T]hese predictions . . . should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" (quoting *Strickland*, 466 U.S. at 695)). The likelihood of that "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.* at 59; *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012); *Hedlund v. Ryan*, 854 F.3d 557, 576 (9th Cir. 2017). Courts evaluate counsel's performance from counsel's perspective at the time and begin with a strong presumption that counsel's conduct is well within the wide range of reasonable conduct. *See, e.g.*, *Beardslee v. Woodford*, 358 F.3d 560, 569 (9th Cir. 2004). When a state court has reviewed a *Strickland* claim, a federal court's habeas review is "doubly deferential"—the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d). *Pinholster*, 563 U.S. at 190, 202.

However, it is not quite that easy in this case. To the extent that the Supreme Court of Nevada addressed these claims,[2] it rejected them because Guardado failed to demonstrate either that counsel was deficient or that he was prejudiced—a conclusion it adopted from the Nevada trial court. (*See* Exh. 107 at 1–2; *see also* Exh. 87 at 5–11.) The Nevada trial court, though, came to this conclusion following an evidentiary hearing. (*See* Exh. 87 at 1 ("There has been an evidentiary hearing. The Court, now being fully advised of the premises, denies the relief request.").) Indeed, the transcripts of the

---

[2] The Supreme Court of Nevada rejected Grounds 2-2 and 2-3 on the merits but did not address Ground 2-1. (*See* Exh. 107 at 7.)

7

evidentiary hearing were provided to the Supreme Court of Nevada, and it is only logical to infer that the court at least glanced at the transcripts in making its decision. (*See* Exh. 103 at 3–4 (citing the transcript of the three-day evidentiary hearing as appearing in volumes one and two of the appellate record).) But the State has failed to provide this Court with those transcripts. (*See* ECF Nos. 16, 49 (indices of Exhs. provided by the State).)

"[I]f the role of a federal habeas court were simply to accept on faith the state court's description of the facts, free from any obligation to review the record on which the state court based its judgment, 'there would hardly be a reason to have a federal habeas statute at all.'" *Nasby v. McDaniel*, 853 F.3d 1049, 1052 (9th Cir. 2017) (citation omitted); *see also id.* at 1054 ("Regardless of what documents the parties originally submit, it is the district court's independent obligation to obtain the relevant portions of the record."). Just because a petition is likely "without merit," that "cannot be said with certainty without a review of the record." *Turner v. Chavez*, 586 F.2d 111, 112 (9th Cir. 1978). When the contents of a transcript that were relied upon by the state court whose decision is under review and are "relevant to the [federal court's] adjudication of [the petitioner's] claims," there is "no alternative" but to review the transcripts or conduct a new evidentiary hearing. *Nasby*, 853 F.3d at 1053 (quoting *Jones v. Wood*, 114 F.3d 1001, 1008 (9th Cir. 1997)).

*Nasby* did not elaborate on what "relevant to the [federal court's] adjudication of [the petitioner's] claims" meant. Because *Nasby* also failed to indicate that a federal district court did not have the option of simply reviewing the claims de novo while assuming the veracity of a petitioner's allegations, this Court will do so here rather than ordering the State to produce the transcripts from the evidentiary hearing.[3] In fact, this

/ / /

---

[3] To the sure, the State has a duty to file, and should have filed, the transcripts from the evidentiary hearing as they are relevant to the resolution of Ground 2 under the AEDPA deferential standard of review. *See* Rule 5(c) of the Rules Governing Section 2254 Cases in the United States District Court ("The respondent must attach to the answer parts of the transcripts that the respondent considers relevant.").

8

approach is supported by *Nasby* in that *Nasby* relies on the fact that:

> a federal habeas court is charged with determining whether a state court's disposition of a claim for relief resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Id.* at 1054 (first quoting 18 U.S.C. § 2254(d)(1); then quoting 18 U.S.C. § 2254(d)(2)). When either of those two standards is met, a federal court reviews the merits of the underlying federal claim de novo, no more and no less. *See Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). So, even if the state court cited only *Harry Potter and the Goblet of Fire* for the proposition that shackling a defendant in a hearing without conducting any inquiry as to the need to shackle that defendant comported with the U.S. Constitution, the shackling of the petitioner would still need to have violated the U.S. Constitution and warrant relief before a federal court may grant the habeas petition.[4] *Cf. Murphy v. Royal*, Nos. 07-7068, 15-7041, 2017 WL 3389877, at *12 (10th Cir. Aug. 8, 2017). Put another way, "it is . . . a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review," but habeas relief does not "automatically issue if a prisoner satisfies the AEDPA standard." *Horn v. Banks*, 536 U.S. 266, 272 (2002). The federal court "must then resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

If this Court is capable of resolving a claim based on the record before it—even if the record is incomplete under *Nasby*—it may do so. Surely if the record provided, when combined with the State's concessions that are agreed to by the petitioner, proves that the petitioner is entitled to habeas relief under AEDPA's deferential standards, a federal

---

[4] Harry looks through Dumbledore's pensive and sees the trial of Barty Crouch, Jr., in which Barty is shackled and kept inside a spiked cage resembling a medieval torture device, without any evidence that the court made "an individualized decision that a compelling government purpose would be served and that shackles are the least restrictive means for maintaining security and order in the courtroom." *United States v. Sanchez-Gomez*, 859 F.3d 649, 661 (9th Cir. 2017) (en banc); *see Harry Potter and the Goblet of Fire* (Warner Bros. 2005).

9

court could give the petitioner relief without waiting for the entirety of the record that is, under a more expansive definition of the term than that which this Court adopts today, "relevant" to that relief. This Court sees no reason why the corollary of that should be impermissible. "To put the matter more familiarly, what is sauce for the goose is sauce for the gander." *Davila v. Davis*, 137 S. Ct. 2058, 2075 (2017) (Breyer, J., dissenting).

An analysis of the district court opinion that *Nasby* reversed further supports the proposition that *Nasby* did not intend to prevent the approach this Court follows today. Using one claim as an example, the district court quoted the Supreme Court of Nevada's finding that "[a]t the evidentiary hearing, counsel testified that the videotape [that Nasby's counsel was ineffective for failing to present at trial] also contained imaging damaging to Nasby." *Nasby v. McDaniel*, No. 3:07-cv-00304, 2014 WL 5822803, at *7 (D. Nev. Nov. 7, 2014), *rev'd*, 853 F.3d 1049. Without looking—or having access to—the transcript of evidentiary hearing, the district court determined that Nasby failed to meet his burden of showing that the Supreme Court of Nevada's "ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* at *8. In other words, it assumed the veracity of the facts claimed by the Supreme Court of Nevada and, based on that, held that trial counsel's decision was a strategic tactical one under *Strickland*. Doing so was impermissible because it abdicated the federal courts' responsibility to independently review the federal legality of a state court's detention of a person inside the United States.

This Court adopts a different approach. As explained above, this Court assumes the veracity of the petitioner's allegations as to any content that may have been discussed during the evidentiary hearing for which the State has failed to provide the transcripts. Doing so, this Court finds that Guardado is not entitled to habeas relief, and therefore the proceedings are not "relevant" to its "adjudication of [the petitioner's] claims," leaving this Court an "alternative" to ordering the State to provide the missing transcripts. *See Nasby*,

853 F.3d at 1053. Moreover, the transcripts are not "relevant" to this Court's adjudication of the claims because, as discussed in more detail below, Guardado's claims of prejudice for all three Grounds of alleged ineffective assistance of counsel failed in light of the overwhelming evidence of his guilt and that a showing that a defendant would be found guilty defeats, "in large part," the defendant's ability to prove a reasonable probable that he would have rejected the plea deal. *Hill*, 474 U.S. at 59.

### A. Ground 2-1

In Ground 2-1 of his amended federal petition, Guardado argues that his trial counsel was ineffective for failing to file a motion to suppress statements that he gave to police because "one of [his] spontaneous statements," as claimed by Detective Reed, was actually made when "answering a question" and was thus "not a spontaneous statement." (*See* ECF No. 47 at 57–58.) Guardado sent his trial counsel a letter asking him to file a motion to suppress his "so-called statement" on June 28, 2004, because he "never once was . . . given [his] *Miranda* rights nor did [he] answer any of their questions." (ECF No. 75 at 11.) He claims that he "had been in custody for over 2 hours and [was] questioned by officers." (*Id.* at 5.) He supports his contention that he was "questioned" by positing to the testimony of Detective Reed at the preliminary hearing, when Reed prefaced an answer with, "when I *asked him* about his brother." (*Id.* at 6 (emphasis added).) Indeed, at the preliminary hearing Reed testified:

> I believe they are brothers. [Guardado] told me that when I asked him.
> . . . .
> . . . I said, "Where would your brother—where would Ernest run to?" He just kind of looked at me, and he said, "Come on, man. He's my brother. I'm not going to give him up." So I made the assumption they were brothers.

(Exh. 2 at 14–15.) And later, Reed testified that Guardado said that he "didn't do the burglary, but [he was] the lookout." (*Id.* at 85.)

Trial counsel would be constitutionally ineffective in this instance only upon a showing of a reasonable probability that *Miranda* warnings were required because Guardado was subject to a "custodial interrogation." *J.D.B. v. North Carolina*, 564 U.S.

11

261, 270 (2011). There is no doubt that Guardado was in custody—he had been chased and arrested on suspicion of burgling Spiro's bar. Thus, the question is whether his interactions with the detectives constituted an "interrogation." The Supreme Court of Nevada did not address this specific claim, although the state trial court held that he failed to demonstrate either deficiency or prejudice because the statements were either spontaneous or a result of a conversation that Guardado initiated. (*See* Exh. 107; Exh. 87 at 11–12.) In other words, the state court held that there was no "interrogation." The evidence on this front is scant, and the transcripts of the evidentiary hearing might be helpful. Guardado alleges that he was "questioned" even though he never "answer[ed] any of their questions." (ECF No. 75 at 11.) Without knowing more about what counsel knew and when, counsel could have been ineffective for failing to investigate the claim that his confession that he was the lookout for the burglary violated *Miranda*, and subsequently, then, for not filing the motion to suppress.

However, even if this Court assumes that counsel would have filed the motion and that the motion would have been granted, Guardado still bears the burden of proving a reasonable probability that, but for the ineffective assistance of counsel, a reasonable person in his shoes would not have accepted the plea deal. While ordinarily a defendant's acceptance or rejection of a plea agreement might well rise and fall with the admissibility of a confession that he was involved in one of the robberies at issue, the evidence against Guardado on that point was already overwhelming—and that, "in large part," defeats his claimed prejudice. *Hill*, 474 U.S. at 59. Guardado and Ernest had already been identified as the top suspects in the string of sports bar burglaries. The night before the burglary, a surveillance team watched Guardado and Ernest load up Ernest's green Saturn. Then, at 5:00 am, Guardado was found across the street from the site of a bar burglary, which conformed to the *modus operandi* of the other burglaries in the string, wearing dark clothes. Ernest's green Saturn was a few hundred feet away. That may have been enough for a jury to convict. But there was more inculpatory evidence. When uniformed police officers approached Guardado, identified themselves as police, and ordered him to

surrender, he ran and threw a two-way walkie talkie onto the roof of a building, hoping that the officers wouldn't find it. And when the officers caught up to Ernest, they discovered another two-way walkie talkie, the stolen gaming-machine cash box, gloves, and a knit cap. And when they searched the crawl space of the four-unit building in which Ernest lived and Guardado has been seen loading up the green Saturn the night before the burglary, they found myriad stolen goods. Moreover, Guardado knew that, in exchange for accepting the plea, his brother's ex-wife would not be subject to indictment or further "harassed," as he put it.[5] (*See* ECF No. 47 at 8–9, 59; *see also id.* at 63 (Ernest's attorney describing the deal).) Indeed, he claimed that this threatening of his ex-sister-in-law "coerced" him into taking the guilty plea.[6] So, regardless of whether the confession was in or not, that "coercion" still would have prompted him to take the plea deal and not go to trial.

Therefore, Guardado has failed to establish a reasonable probability that a reasonable person in his shoes would have elected to go to trial and foregone the plea

---

[5] On March 5, 2014, Ernest sent a letter to the court informing it that, "through [his] court appointed attorney Mr. Merkin, [Ernest has] been put under extreme duress by threats and coercion from the district attorney." (ECF No. 47 at 59.) The State threatened to charge him for committing the other burglaries in the string and for being a habitual criminal unless he pleaded guilty. (*Id.*) Similarly, the State said that it would charge his ex-wife "with felonies" and "subpoena her to testify against" Ernest, and, according to Ernest, "handed her an indictment with her name on it." (*Id.* at 59–60.) When Ernest claimed that the State wasn't allowed to do so, his attorney informed him that it could. (*Id.* at 59.) Ernest claimed that on February 5, 2004, his ex-wife came to visit him and, because of what it was "doing to here [sic] mentally[,] after her visit [he] called Mr. Merkin [sic] office and left a message . . . stat[ing he] would plead guilty to whatever they wanted as long as they left [his] ex-wife alone and quit harassing her." (*Id.* at 61.) Ernest explained that his counsel explained to Guardado that if Guardado did not agree to the plea bargain, Ernest's ex-wife would be arrested or indicted and that, if Guardado went to trial, he thought that they would lose. (*Id.*) Guardado sent a copy of this same letter. (Exh 20.)

[6] There is no reasonable argument before this Court that this "coercion," as Guardado and Ernest characterize it, is constitutionally impermissible because there was reason to think that Ernest's wife might have been involved in possessing the stolen goods or burgling, given that the good were stored at her apartment and they used the car co-owned by Ernest and her to commit the crimes. *See Bordenkircher v. Hayes*, 434 U.S. 357, 361 & n.7 (1978). Indeed, both Guardado's and Ernest's counsel told them that it was permissible. (*See* ECF No. 74 at 12.)

13

agreement if counsel had investigated Guardado's *Miranda* claim and found grounds sufficient for the state trial court to grant a motion to suppress his confession. Ground 2-1 provides no basis for habeas relief.

**B.     Ground 2-2**

In Ground 2-2 of his amended federal petition, Guardado argues that his trial counsel was ineffective "for advis[ing] Guardado to plead guilty without conducting any investigation." (ECF No. 47 at 8; *see also* ECF No. 75 at 2.) Guardado explains that he told his counsel that "he could not have possessed the stolen property[] [because] he was just a guest at his brother's house" where the stolen property was found. (ECF No. 47 at 10.) Further, the "stolen property was not located under [Ernest's] house as stated by police, [b]ut was located in the crawl space of the 4-plex [Ernest] lived in" and the "Detectives made it seem as though the apartment was a house at the grand jury to lead the grand jury to believe [Guardado] and [Ernest] had possession and access" to the stolen property. (*Id.*) He contends that "had counsel investigated[,] . . . there is a good chance [his] motions would have been granted [because an] investigator could have . . . prov[ed] [his] claims of [in]accessibility to [the] crawl space." (*Id.*) Therefore, he argues that he "would have proceeded to trial and not accepted [the] plea deal." (*Id.* at 9.)

These facts are even less compelling that those related to his confession. *See Stankewitz v. Woodford*, 365 F.3d 706, 717–19 (9th Cir. 2004) (focusing on the impact that information that would have been revealed by the investigation would have on the outcome). Whether Guardado lived in Ernest's apartment or elsewhere is hardly material to an inquiry of whether he committed the burglaries or was, at some point, in possession of the stolen goods found under the apartment. And his contentions about the crawl space being in a four-unit apartment complex rather than a standalone home could have easily been brought up at trial—with or without investigation beforehand. Moreover, Guardado would still be faced with the overwhelming evidence described in Ground 2-1, above.

Therefore, Guardado failed to establish a reasonable probability that a reasonable person in his shoes would have elected to go to trial and foregone the plea agreement if

counsel had investigated and discovered the facts he alleged. Ground 2-2 provides no basis for habeas relief.

### C. Ground 2-3

In Ground 2-3 of his amended federal petition, Guardado argues that his trial counsel was ineffective because counsel "misinformed [him] about his ability to withdraw his guilty plea . . . as stated in [the] plea memorandum." (ECF No. 47 at 8–9.) Guardado complains that he was not "inform[ed] . . . that he could not withdraw his guilty plea as stated in the plea agreement." (Exh. 54 at 7; *see also id.* at 8 ("[C]ounsel failed to properly advise him of the consequences of his plea . . . .").)

Guardado entered his plea of guilty before the state trial court on September 15, 2004, less than a week before trial was set to start. During the colloquy with the court, Guardado and Ernest were both asked if they understood the plea agreements, if they agreed to waive their rights, and if they wanted to plead guilty. (*See* Exh. 31 at 3–28.) They both said yes. So irrespective of what counsel had told Guardado months earlier about what the plea agreement he was signing back then meant, the state trial court went over the terms of the plea deal and the fact that he was waiving any rights to a trial. If, at that time, he thought that he could reverse the guilty plea he was about to enter or had any reservations about pleading guilty, he would have raised them to the district court. But he did not. Guardado testified that he understood these rights and the state trial court found that he understood these rights. Less than a month later, Ernest claimed that they both wanted to change their pleas back to not guilty because they "were led to believe, and in the paperwork that we got it stated that we were led to believe pretty much that we were able to withdraw the plea if . . . we decided against it." (Exh. 33 at 5–6.) When asked if Guardado had any additional bases for withdrawing his plea, Guardado did not. (*Id.* at 8.)

Moreover, this claim fails because Guardado does not explain *why* he would have withdrawn his guilty plea and gone to trial had that actually been an option. *See Turner v. Calderon*, 281 F.3d 851, 855 (9th Cir. 2002) (rejecting "bare assertions"). The only facts

15

that Guardado claims support a reasonable probability that he would not have accepted the plea deal are that he thought the plea was reversible and that, when his brother stated that he wanted to go to trial, he said, after being told by his counsel that this was not an option immediately prior to the hearing, that he wanted to go to trial as well. (*See* ECF No. 47 at 7.) However, as the Supreme Court noted in *Hill*, the predictions about whether Guardado would have tried his luck at trial are made "without regard for the 'idiosyncrasies of the particular decisionmaker.'" 474 U.S. at 59–60 (quoting *Strickland*, 466 U.S. at 695). These two facts do not adequately support the notion that he would have not accepted the plea agreement. His claim has little more persuasive value than a bare assertion— and such assertions categorically fail to meet the *Strickland* prejudice standard. *See Missouri v. Frye*, 566 U.S. 133, 150 (2012) (holding that a defendant met the "reasonable probability" standard of having been willing to accept a plea that counsel failed to communicate to him when he later "pleaded guilty to a more serious charge, with no [beneficial] promise[s]" that were included in the original plea).

Guardado's claim of prejudice further, and independently, fails in light of the evidence and arguments presented in Grounds 1-1 and 1-2, above, because they render his claim that he would have wanted to go to trial when he signed the plea agreement simply unbelievable. *See Velazquez v. United States*, 651 Fed. App'x 620, 623 (9th Cir. 2016) (considering the strength of the evidence and the availability of trial defenses). Going to trial would have been a markedly nonsensical idea given that multiple counts were dismissed and others not pursued in the first place because of the plea agreement. This Court is not persuaded that even Guardado ever truly entertained the notion, let alone that any objectively *reasonable* defendant in his shoes would have. Therefore, he has failed to demonstrate a reasonable probability that he would not have accepted the plea deal had he known that it was not reversible.

This conclusion is further reinforced by the fact that Ernest's plea deal included an admission that he committed these crimes with Guardado. (Exh. 32 at 3.) Whether Guardado's counsel was ineffective for failing to tell Guardado that he could not withdraw

16

his plea deal does not alter the existence of Ernest's plea deal and the damaging effect that would have had if Guardado went to trial, thus making it less likely that Guardado would have gone to trial at all.

As an aside, Guardado admits that his counsel testified at the evidentiary hearing and that his counsel claimed not to have told Guardado that he could withdraw his guilty plea. (*See* ECF No. 75 at 7–8; *see also id.* (attempting to impeach counsel's credibility with claims of perjury in another proceeding); ECF No. 47 at 12 (demonstrating substantial knowledge of the content of the transcripts of the evidentiary hearing).) Assuming this Court is allowed to consider that testimony because all parties and courts agree to its existence, its inclusion only solidifies the result reached here. With the above reasons for debunking Guardado's assertion that he ever either thought that the plea agreement was reversible or that he wanted to go to trial and not accept the plea deal, the only way that the Supreme Court of Nevada's determination that there wasn't any prejudice could involve an unreasonable determination of fact or be contrary to, or an unreasonable application of, U.S. Supreme Court precedent would be if trial counsel admitted what Guardado alleges—and the summary of the evidentiary hearing provided by both parties and the state courts and Guardado's characterization of that hearing make clear that is not the case.

Ground 2-3 provides no basis for habeas relief.

/ / /

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

## IV. CONCLUSION

Accordingly, it is hereby ordered that Guardado's petition for a writ of habeas corpus is denied on the merits, and this action is dismissed with prejudice.[7]

Because reasonable jurists would not find this decision to be debatable or incorrect, it is further ordered that a certificate of appealability is denied. The Clerk of Court is directed to enter judgment, in favor of respondents and against Guardado, dismissing this action with prejudice.

DATED THIS 25th day of August 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[7] A petitioner may not use a reply to an answer to present additional claims and allegations that are not included in the federal petition. *See, e.g.*, *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). To the extent that Guardado has done so in his federal Reply, this Court does not consider these additional claims and allegations.